UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

————————————————————————————

URI STUDENT SENATE, et al.,          )
                                     )
            Plaintiffs,              )
                                     )
        v.                           )    C.A. No. 08-207 S
                                     )
TOWN OF NARRAGANSETT, et al.,        )
                                     )
            Defendants.              )

————————————————————————————

**AMENDED OPINION AND ORDER**

WILLIAM E. SMITH, United States District Judge.

Each fall, students at the University of Rhode Island ("URI") flock to the nearby town of Narragansett (the "Town") to take advantage of its abundant seasonal housing. However, all do not welcome their presence. The Town council blames student renters for throwing rowdy parties that encourage lawbreaking, such as underage drinking and fighting. To curb this behavior, the Town passed an ordinance banning so-called "unruly gatherings" — ones at which partygoers commit unlawful acts that disturb the neighbors. Students, the URI student government, and owners of rental property in the Town ("Plaintiffs") believe the enactment is unconstitutional and preempted by a state statute. Seeking to nullify the measure, they have brought this action against the Town, various Town officials, and the Town council ("Defendants"). Presently before the Court are the

parties' cross-motions for summary judgment, which turn squarely on the question of whether the "unruly gatherings" ordinance is constitutionally valid on its face.

After holding a hearing on this matter on November 17, 2009, and considering the issues carefully, the Court concludes the Ordinance is indeed constitutional.

I.   **Background**

A.   **The Challenged Ordinance**

At bottom, this dispute springs from friction between students and year-round residents of the Town.   Approximately twenty-two percent of the housing stock in the Town consists of "seasonal or vacation" rental units, attracting many students during the school year.   (See Agreed Statement of Facts, ("Facts") ¶ 6.)   The Town has long complained of quality-of-life issues resulting from high turnover and absentee landlords.   Its concerns include overcrowding, property abuse, excessive traffic, noise, litter, public drunkenness, underage drinking, and fights.   In the Town's view, "large gatherings of people, such as parties" are often to blame for these annoyances.   (See Narragansett, R.I. Nuisance Ordinance ch. 856, preamble (2005), Ex. A to Facts.)   The gatherings "frequently become loud and unruly to the point that they constitute a threat to the peace, health, safety, or general welfare of the public." (Id.)

To deter such conduct, the Town enacted a nuisance ordinance targeting "unruly gatherings" in 2005 (the "Ordinance"). (See id.) The key provisions of the current version provide as follows:

**Sec. 46-31. Public nuisance.**

(a) It shall be a public nuisance to conduct a gathering of five or more persons on any private property in a manner which constitutes a substantial disturbance of the quiet enjoyment of private or public property in a significant segment of a neighborhood, as a result of conduct constituting a violation of law. Illustrative of such unlawful conduct is excessive noise or traffic, obstruction of public streets by crowds or vehicles, illegal parking, public drunkenness, public urination, the service of alcohol to minors, fights, disturbances of the peace, and litter.

(b) A gathering constituting a public nuisance may be abated by all reasonable means including, but not limited to, an order requiring the gathering to be disbanded and citation and/or arrest of any law violators under any applicable ordinances and state statutes. . . .

**Sec. 46-32. Notice of unruly gathering; posting, mailing.**
(a) When the police department intervenes at a gathering which constitutes a nuisance under this article, the premises at which such nuisance occurred shall be posted with a notice stating that the intervention of the police has been necessitated as a result of a public nuisance under this article caused by an event at the premises, the date of the police intervention, and that any subsequent event within the period set forth below on the same premises, which necessitates police intervention, shall result in the

3

joint and several liability of any guests causing the
public nuisance, or any persons who own or are
residents of the property at which the public nuisance
occurred, or who sponsored the event constituting the
public nuisance as more fully set forth below.  Any
notice posted between September 1 and May 31 of any
year shall remain posted until May 31.  Any notice
posted between June 1 and August 31 of any year shall
remain posted until August 31.

(b) The residents and owner of such property shall be
jointly responsible for ensuring that such notice is
not removed or defaced and it shall be an ordinance
violation carrying a penalty of a minimum, mandatory
$100.00 fine in addition to any other penalties which
may be due under this section if such notice is
removed, obscured or defaced, provided, however, that
the residents of the premises or sponsor of the event,
if present, shall be consulted as to the location in
which such notice is posted in order to achieve both
the security of the notice and its prominent display.

Ordinance §§ 46-31-32 (2007).

The Ordinance thus empowers the Town police to break up
parties that they decide are causing a "substantial disturbance
of the quiet enjoyment of private or public property in a
significant segment of a neighborhood." Id. § 46-31(a). The
police may only act, however, if the disturbance is a "result"
of a "violation of law." Id. The Ordinance gives a non-
exhaustive list of misdemeanors that authorize police to
intervene. These include "excessive noise or traffic,
obstruction of public streets by crowds or vehicles, illegal
parking, public drunkenness, public urination, the service of

4

alcohol to minors, fights, disturbances of the peace, and litter." Id.

After dispersing a gathering determined to be a nuisance, the police must then post a notice "prominently" on the premises.  Id. § 46-32(a)-(b). This takes the form of a ten-by-fourteen-inch orange sticker placed on or about the front entrance.  (See Facts ¶ 21-22.)  The sticker warns that any further police intervention for a nuisance violation at the same address during a designated time period will result in "joint and several liability" for sponsors of a gathering, the residents and owners of the premises, and any guests who cause the nuisance.  The time period runs for the duration of the seasonal housing cycle, during which the sticker must remain in place.  If posted September 1 or after, it stays until May 31; if posted after May 31, it stays until September 1.  Removing or otherwise tampering with the sticker during that time carries a $100.00 fine for residents and landlords.  See Ordinance § 46-32 (b).  Landlords also receive copies of the notice in the mail. See id. § 46-33.

Section 46-34 of the Ordinance identifies the parties who may be punished for subsequent police responses to houses bearing stickers:

**Sec. 46-34.  Persons liable for subsequent response to gathering constituting a public nuisance.**

(a) If the police department is required to respond to a gathering constituting a public nuisance on the premises more than once in any posting periods set forth in Section 46-32(a), the following persons shall be jointly and severally liable for fines as set forth below:

(1) The person or persons who own the property where the gathering constituting the public nuisance took place, provided that notice has been mailed to the owner of the property as set forth herein and the gathering occurs at least two weeks after the mailing of such notice.

(2) The person or persons residing on or otherwise in control of the property where such gathering took place.

(3) The person or persons who organized or sponsored such gathering.

(4) All persons attending such gatherings who engage in any activity resulting in the public nuisance.

(5) Nothing in this section shall be construed to impose liability on the resident or owners of the premises or sponsor of the gathering, for the conduct of persons who are present without the express or implied consent of the resident or sponsor, as long as the resident and sponsor have taken all steps reasonably necessary to exclude such uninvited participants from the premises, including landlords who are actively attempting to evict a tenant from the premises.

Ordinance § 46-34(a).

The effect of § 46-34 is to make landlords, residents, party sponsors, and any guests who cause a nuisance jointly and severally liable for any additional unruly gatherings at stickered houses during the same season. However, residents, owners, and sponsors may assert the defense that only "uninvited participants" engaged in illegal conduct. This requires that the resident, owner, or sponsor took "all steps reasonably necessary" to exclude such party-crashers. Id. § 46-34 (a)(5). For landlords, these measures may include "active[]" attempts to evict a tenant. Id.[1] Finally, section 46-35 establishes the penalties for liable parties. Id. § 46-35(a). The first post-sticker police intervention at an unruly gathering during the posting period triggers a fine of $300; the second, $400; and the third, $500. See id. Violators may also receive community service for the first nuisance abatement; it is mandatory starting with the second. See id. § 46-35(b).

The Town compiles information related to enforcing the Ordinance. "Nuisance house lists" display all addresses where police have dispersed an "unruly gathering," and show which houses have stickers during a given season. (Facts Ex. D.) The

---

[1] In addition, § 46-34(b) creates an exception for "isolated instances" of nuisance-causing behavior by invited guests requiring police intervention. Provided the unlawful conduct was unforeseeable, this defense relieves residents and sponsors of liability.

7

Town also maintains a "URI Stats" chart to track data on infractions specifically committed by URI students. (See Pls.' Resp. Mem. 6.)

**B.   Procedural History**

Plaintiffs fall into four categories: (i) individual students residing in the Town who have been charged with violating § 46-31, and claim they were subjected to discipline at URI as a result; (ii) individual students who had their rental homes posted with orange stickers, and claim that as a result they were evicted from their apartments and disciplined by URI; (iii) landlords who had their properties posted with orange stickers and claim they have not been able to rent their property as a result; and (iv) the URI student senate, an elected body purporting to represent the interests of URI students.

Prior to this lawsuit, prosecution of the Plaintiffs in category (i) had been underway in the Town's Municipal Court. However, Defendants suspended those proceedings pending the outcome of this case. In May 2008, all Plaintiffs filed a complaint in Rhode Island Superior Court against Defendants, challenging the Ordinance as invalid under federal and state

law.[2]   Defendants removed the action to federal court in this District on the basis that many of the claims depended on questions of federal law.   Plaintiffs petitioned for remand to state court, but Judge Torres of this Court denied the motion in September 2008.   The case was subsequently reassigned to this Court.

Plaintiffs raise six arguments in their frontal attack on the Ordinance: (i) the Ordinance violates their rights to substantive due process under the Fourteenth Amendment; (ii) it offends due process under the Fourteenth Amendment because it is too vague; (iii) it violates the First Amendment because it is overbroad; (iv) it denies Plaintiffs procedural due process under the Fourteenth Amendment, because police may post "orange stickers" without a hearing; (v) it deprives Plaintiffs of equal protection of the law under the Fourteenth Amendment; and (vi) it is preempted by the Rhode Island Landlord-Tenant Act. Defendants seek dismissal of each claim.   The parties have stipulated to all material facts.   Accordingly, the outcome of the case turns entirely on whether the Ordinance survives Plaintiffs' facial challenges.

---

[2] Defendants apparently disputed the standing of the student senate in state court proceedings, without success.   The disposition of that challenge is not part of the record here.

## II. Discussion

### A. Substantive Due Process

Several of Plaintiffs' claims depend on how much, if any, constitutionally-protected activity is at stake, so it is most economical to initially address the assertion that the Ordinance burdens substantive due process rights. Plaintiffs do not invoke the due process doctrine used for redressing state action that "shocks the conscience." Cf. Rivera v. Rhode Island, 402 F.3d 27, 33-34 (1st Cir. 2005). Rather, they contend that the Ordinance targets fundamental "privacy and associational rights." (Pls.' Mem. 15.) Plaintiffs' heavy reliance on Lawrence v Texas, 539 U.S. 558 (2003), shows how ill-suited the constitutional right of privacy is to their claims. Lawrence is the culmination of a line of cases holding that states cannot criminalize "choices central to personal dignity and autonomy." Id. at 574 (quoting Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 851 (1992)). The Supreme Court has held that these "personal decisions" relate to "marriage, procreation, contraception, family relationships, child rearing, and education." Id. at 573-74.

The Ordinance in issue here does not punish such decisions, or even remotely relate to any of the topics identified in Casey. It does not make private or intimate behavior criminal. Rather, the Ordinance targets nuisances at "gatherings" of five

10

or more people caused by an underlying misdemeanor, such as underage drinking or fighting. The possibility that some form of intimate activity of the type <u>Lawrence</u> contemplated may be going on behind the scenes is beside the point — that is not what the law is targeting. This line of attack holds no more water than one that claims an overnight parking ban in a city park is unconstitutional because the parkers may be having sex in the back seat.

Plaintiffs also fail to articulate how the Ordinance inhibits any constitutionally protected "intimate association." They cite the right to choose one's roommates and friends. Aside from the fact that the Ordinance does not mention, let alone criminalize, these choices, "[t]he unmarried cohabitation of adults does not fall under any of the Supreme Court's bright-line categories for fundamental rights" in the area of intimate association. <u>Poirier v. Mass. Dep't of Corr.</u>, 558 F.3d 92, 96 (1st Cir. 2009). The same is true of "close personal friendships," even those embodied by formal clubs or organizations, which do not appear here. <u>See</u> <u>Piscottano v. Murphy</u>, 511 F.3d 247, 278-79 (2d Cir. 2007). Beyond that, Plaintiffs have not explained how the relationships at issue "involve 'personal bonds' that have 'played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs[, and] thereby foster

diversity and act as critical buffers between the individual and the power of the State.'" _Poirier_, 558 F.3d at 95 (quoting the intimate association standard from _Roberts v. U.S. Jaycees_, 468 U.S. 609, 618-19 (1984)).   The rights they assert therefore do not qualify for constitutional protection.

   **B.   The Void-For-Vagueness Doctrine**

       Plaintiffs assert that § 46-31 of the Ordinance is unconstitutionally vague, because it hinges on imprecise adjectives that invite capricious application by the police.   In particular, Plaintiffs object to the words "unruly gathering," "substantial disturbance," "public nuisance," and "a significant segment of a neighborhood."   These terms do obligate the police to exercise discretion in enforcing the Ordinance.   If such phrases were unmoored, Plaintiffs might have a viable complaint, but here the Ordinance provides sufficient guidance to satisfy the requirements of due process.

       **1.   Legal standard**

   "[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." _United States v. Lachman_, 387 F.3d 42, 56 (1st Cir. 2004) (quoting _Kolender v. Lawson_, 461 U.S. 352, 357 (1983)). "[F]lexibility and reasonable breadth," are

acceptable, and "meticulous specificity" is not required.
Grayned v. City of Rockford, 408 U.S. 104, 110 (1972). There is
no easy test for unconstitutional vagueness. The outcome
depends on whether, taken in the "particular context" of
operation, Grayned, 408 U.S. at 112, the Ordinance establishes
"minimal guidelines to govern law enforcement." Kolender, 461
U.S. at 358.

### 2. Level of scrutiny

Laws that chill speech or other protected conduct receive
closer scrutiny in a vagueness analysis. See Ridley v. Mass.
Bay Transp. Authority, 390 F.3d 65, 94 (1st Cir. 2004) (noting
that the absence of a chilling effect relaxes scrutiny for
vagueness, and citing Children of the Rosary v. City of Phoenix,
154 F.3d 972, 983 (9th Cir. 1998)). The classic example of such
a law is one that "abut[s] upon . . . First Amendment freedoms"
because its scope is indefinite. Grayned, 408 U.S. at 108-09.
The Supreme Court has also applied closer scrutiny to laws that
discourage the exercise of other freedoms, such as the liberty
interest in "loiter[ing] for innocent purposes" in public. City
of Chicago v. Morales, 527 U.S. 41, 53-54 (1999) (invalidating
an anti-loitering law on vagueness grounds).[3] On the other hand,

---

[3] Plaintiffs cannot rely on any right to loiter. The
Ordinance does not punish party guests who loiter innocently,
but only those who "engage in any activity resulting in the

if the law has no effect on protected conduct, a plaintiff "must demonstrate that the law is impermissibly vague in all of its applications." Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 497 (1982). This is a "dauntingly high hurdle." Donovan v. City of Haverhill, 311 F.3d 74, 77 (1st Cir. 2002).

Can Plaintiffs identify any protected conduct that the Ordinance might chill? The Court has already determined that substantive due process privacy and associational rights are not at issue. What about free speech, expression, and assembly? Plaintiffs do not assert that any "gatherings" dispersed pursuant to the Ordinance were political demonstrations, see Grayned, 408 U.S. at 105, meetings of organizations that "seek[] to transmit . . . a system of values" to their members, see Boy

---

public nuisance." Ordinance § 46-34(5). Section 46-31(a) defines the activity that "result[s]" in a "public nuisance:" "conduct constituting a violation of law," such as underage drinking or public urination. Id. § 46-31(a). This means that only guests who break laws that Plaintiffs do not challenge (such as the legal drinking age, parking ordinances, etc.) may be fined. True, there is no language in § 46-34 limiting liability for owners, event sponsors, and residents to people who "engage" in nuisance-causing crimes. But unlike the anti-loitering law in Morales, the Ordinance would not penalize party-going owners, sponsors, or residents because they were loitering. Instead, it would punish them for failing to prevent a party from escalating into a nuisance because of lawbreaking guests.

Scouts of Am. v. Dale, 530 U.S. 640, 650 (2000), or concerts, see Ward v. Rock Against Racism, 491 U.S. 781, 790 (1989) (explaining that playing music enjoys First Amendment protection). Instead, Plaintiffs proclaim that "[s]tudents should have the right to congregate and socialize whether for political or social reasons." (Pls.' Resp. Mem. 16.) In fact, nothing in the record suggests that the gatherings serve anything other than "social purposes," an objective that falls flat. Anyone who has college-aged children knows that "hanging out" is an important, even vital social experience. But just as the Constitution does not "recognize[] a generalized right of 'social association'" of the type that includes "chance encounters in dance halls," City of Dallas v. Stanglin, 490 U.S. 19, 25 (1989), it does not protect college house parties, no matter how many problems of the world may be solved at them. Under Stanglin, Plaintiffs cannot claim constitutional protection for get-togethers that do not serve political or expressive ends.[4]

For these reasons, the Court has "no serious concern" about a chilling effect. Ridley, 390 F.3d at 94. Nevertheless, it is conceivable that Defendants could use the Ordinance to disrupt

---

[4] In other words, while the Beastie Boys might disagree, the First Amendment does not imply a "right to party" dissociated from expression.

political meetings or religious congregations at students'
homes.  Therefore, although the record lacks evidence of such
events, the Court examines the Ordinance closely for
impermissible vagueness.[5]

### 3.  Analysis

The definition of "public nuisance" in § 46-31(a) rests, in
part, on the meaning of the phrase, "a substantial disturbance
of the quiet enjoyment of private or public property in a
significant segment of a neighborhood."  Ordinance § 46-31(a).
It is true that, on their own, the words "substantial" and
"significant" draw no clear line between legal and illegal
gatherings.  Their "flexibility" and "breadth" leave discretion
to the police.  Grayned, 408 U.S. at 110.  For this reason,
these same adjectives have created vagueness problems in other
municipal ordinances.  See Fantasy Book Shop, Inc. v. City of
Boston, 652 F.2d 1115, 1119 (1st Cir. 1981) (finding the phrase
"otherwise significantly harm[] the legitimate protectable
interests of the affected citizens of the city" too vague as
grounds for denying a public amusement license); Ellwest Stereo
Theater, Inc. v. Boner, 718 F. Supp. 1553, 1581 (M.D. Tenn.

---

[5]  That the Ordinance imposes criminal penalties also
warrants a careful review.  See Kolender v. Lawson, 461 U.S.
352, 358 (1983).

1989) (finding "substantial or significant" unconstitutionally vague in an adult bookstore ordinance).

What sets the Ordinance apart from such laws is the latter part of § 46-31(a), which imposes a key precondition to enforcement. Before the police can step in, someone at the party must first engage in "conduct constituting a violation of law," such as underage drinking or public urination. Id. § 46-31(a). Officers may not place an orange sticker on any premises, or cite anyone in connection with an "unruly gathering," unless one of the revelers first commits a misdemeanor. The language of § 46-31(a) requires — and Defendants confirmed at oral argument — that this infraction must pertain to a "law" other than the Ordinance itself, such as a littering ordinance or the legal drinking age.[6] Consequently, the Ordinance does not take effect "only at the whim of [a]

---

[6] Plaintiffs dispute this interpretation of the Ordinance, arguing that police intervention is "not limited to incidents where specific laws have been broken." (Pls.' Resp. Mem. 14-15.) The plain terms of the Ordinance demonstrate otherwise, as discussed above. In addition, Defendants attest that § 46-31(a) does, in fact, carry a misdemeanor prerequisite. Thus, even if the language of the Ordinance plausibly admitted Plaintiffs' proposed interpretation (which it does not), the Court would be free to accept Defendants' narrower view. In the context of a facial challenge, courts "should extend a measure of deference to the judgment of the legislative body that enacted the law." IMS Health Inc. v. Ayotte, 550 F.3d 42, 62 (1st Cir. 2008) ("This perspective requires us to give [the government's proposed] exceptions [to the law in question] their full scope and eliminates any chilling effect.") (internal quotation marks, alterations, and citation omitted).

police officer." Shuttlesworth v. City of Birmingham, 382 U.S. 87, 90 (1965). Instead, the misdemeanor prerequisite shapes a "particular context" for enforcement. Grayned, 408 U.S. at 112; see Dupres v. City of Newport, Rhode Island, 978 F. Supp. 429, 434 (D.R.I. 1997) ("[T]he vagueness of a statute's terms can often be dispelled by language reciting the statute's purpose and specifically defining the setting in which it applies.").

Moreover, § 46-31(a) sharpens the picture of what gatherings qualify as "nuisances" by listing "illustrative" predicate offenses. Plaintiffs do not argue that the listed crimes are vaguely defined. In particular, "public urination, the service of alcohol to minors," and "litter" are unambiguous. Ordinance § 46-31(a). Other examples, such as "obstruction of public streets by crowds or vehicles," "public drunkenness," and "fights," are clear enough to "communicate [the] reach" of the Ordinance in "words of common understanding." Boos v. Barry, 485 U.S. 312, 332 (1988). That the list is non-exclusive creates no fatal flaw. The "mere fact that a statute or regulation requires interpretation does not render it unconstitutionally vague." Lachman, 387 F.3d at 56. The Ordinance thus need not enumerate every conceivable breach of local, state, or federal law that might trigger a nuisance. Rather, it effectively narrows its scope by "suppl[ying] . . .

18

specificity by way of examples of the conduct which [it] cover[s]." <u>Parker v. Levy</u>, 417 U.S. 733, 754 (1974).[7]

The term "quiet enjoyment" further hones the context for the Ordinance by calling attention to the reasons for its enactment. The preamble to the 2005 version identifies threats to the "peace, health, safety, or general welfare of the public as a result of" the same crimes listed in 46-31(a) of the current version ("excessive noise, excessive traffic," etc.). (<u>See</u> Facts Ex. A.) The preamble's concern for such "quality of life" issues, mirrored in the Town's Comprehensive Plan, provides additional guidance for police. (Facts ¶ 7.) The Town may properly rely on these sources, though they are not part of the definition of a "public nuisance" itself, to demonstrate that the circumstances in which the Ordinance applies are sufficiently narrow. <u>See</u> <u>Grayned</u>, 408 U.S. at 110-11 (looking to the preamble of a statute to determine context); <u>IMS Health</u>

---

[7] At oral argument, counsel for Defendants disclosed that police are not obligated to issue citations for predicate misdemeanors when enforcing the Ordinance. For purposes of a vagueness challenge, this does not matter. In this context, the significance of the "violation of law" provision is not that it assures process for Ordinance violators in the form of a misdemeanor hearing. Rather, as emphasized above, the point of the petty offense prerequisite is that it restricts the circumstances in which the Ordinance may be invoked. The fact that police retain discretion to charge a violation of the Ordinance, but not the underlying misdemeanor, does not lift that restriction. Whether or not an independent "violation of law" is itself prosecuted, the police cannot enforce the Ordinance unless and until they identify one.

Inc. v. Ayotte, 550 F.3d 42, 62 (1st Cir. 2008) (relying on the "state's articulated purpose" of a statute to judge context).

In sum, the requirement that someone at a "gathering" must commit a crime, the concrete examples of predicate misdemeanors, and the concern for "quiet enjoyment" of property and quality of life, together, achieve the necessary "minimal guidelines" to govern the police in enforcing the Ordinance. Kolender, 461 U.S. at 358. For that reason, the Ordinance is not unconstitutionally vague because it uses the words "substantial," "significant," and "nuisance." See Doctor John's, Inc. v. City of Roy, 465 F.3d 1150, 1159-60 (10th Cir. 2006) (approving "significant or substantial" language in adult business statute where the law provided adequate guidelines for police); Helguero v. City of Costa Mesa, 134 F.3d 377 (9th Cir. 1998) (unpublished table decision) (rejecting vagueness challenge to entertainment permit ordinance designed to fight noise that turned on a "substantially adverse impact"); see also Reeves v. McConn, 631 F.2d 377, 386 (5th Cir. 1980) (approving of the term "nuisance" in a noise regulation); Kreimer v. Bureau of Police for Town of Morristown, 958 F.2d 1242, 1268 (3d Cir. 1992) (finding the word "nuisance" was not too vague because it involved "an objective reasonableness test" rather than a subjective annoyance test).

###### C.   Overbreadth

Plaintiffs contend that the Ordinance "is over-inclusive in that it punishes individuals who have committed no crime or violation for simply being present at or associated with a location or an event." (Pls.' Mem. 17.)   To the extent this argument relies on the constitutional overbreadth doctrine, it is misconceived.

"Overbreadth analysis looks to whether a law sweeps within its ambit protected activities as well as unprotected ones." Fantasy Book Shop, 652 F.2d at 1122 n.9 (citation and internal quotation marks omitted).   To invalidate a law on overbreadth grounds, the "impermissible applications of the law" must be "substantial when judged in relation to [its] plainly legitimate sweep."   Morales, 527 U.S. at 52 (citation and internal quotation marks omitted).   As a result, if a law does not reach "a substantial amount of constitutionally-protected conduct," the "overbreadth challenge . . . must fail."   Whiting v. Town of Westerly, 942 F.2d 18, 21 (1st Cir. 1991).

As explained above, nothing in the record indicates that the Ordinance reaches protected conduct, let alone a "substantial amount" of constitutional activity.   Speculation that it could, in some circumstances, interfere with First Amendment expression is not sufficient to sustain an overbreadth attack.   Even laws that "infringe on" some constitutionally

protected rights do not rise to the level of impermissible overbreadth.   See Morales, 527 U.S. at 52 (discussing an ordinance that chilled the exercise of constitutional freedoms but did not fit within the overbreadth doctrine because it did not affect a "substantial amount" of protected conduct).[8]   The Court thus discerns no overbreadth problem with the Ordinance.

### D.   Procedural Due Process

Plaintiffs argue that the "orange sticker" provision in § 46-32 lets the police "defame[] and humiliate[]" landlords and tenants without due process of law.   (Pls.' Mem. 14.)   That

---

[8] At best, Plaintiffs' argument amounts to a misplaced challenge to what appears to be a strict liability feature of the Ordinance.   In what would seem to be its most extreme application, § 46-34(a)(2) could conceivably extend to a party sponsor's roommate studying in the library who did not even know about the gathering at his house — in other words, to someone who did not take any culpable action or possess any culpable mental state.   This, however, would not necessarily create a constitutional problem.   While strict liability offenses "generally are disfavored," there are exceptions.   Staples v. United States, 511 U.S. 600, 606 (1994).   Some laws that are "'regulatory' in nature" can impose strict liability if they provide only for misdemeanor offenses punishable by fines instead of imprisonment.   Karlin v. Foust, 188 F.3d 446, 476-77 (7th Cir. 1999) (discussing misdemeanor offenses that could fairly impose strict liability and citing cases); see, e.g., United States v. Zak, 486 F. Supp. 2d 208, 213-14 (D. Mass. 2007) (upholding a strict liability misdemeanor provision of the Migratory Bird Treaty Act).   In any event, the fact that neither party briefed this issue precludes the Court from fully addressing it.

there is no opportunity to challenge the posting of "unruly gathering" notices is, without question, the most troubling aspect of the Ordinance. However, to demonstrate that a law permits the deprivation of "life, liberty, or property, without due process," U. S. Const. amend. XIV, a party must first identify a specific "liberty" or "property" interest harmed by the enactment. Here, under First Circuit precedent defining such freedoms, the interests cited by Plaintiffs fall shy of constitutional protection. For that reason, the Court is constrained to uphold the Ordinance as compliant with due process.

### 1. Alleged liberty and property interests

Plaintiffs' procedural due process claim centers on the stigmatizing effect of § 46-32. The orange stickers, they assert, publicly brand residents and owners of the premises as criminals. Compounding the problem, the Town informs URI when any student receives a sticker, keeps a list of "nuisance" houses, and has, according to Plaintiffs, notified local newspapers of the postings. (See Pls.' Mem. 14.) Plaintiffs contend that the absence of an opportunity for a hearing on whether there are legitimate grounds to place a sticker on a house — and thereby to malign the reputation of its owner and residents — offends due process. They rely on Wisconsin v. Constantineau, 400 U.S. 433 (1971) and Goss v. Lopez, 419 U.S.

565 (1975), for the principle that due process protects "a person's good name, reputation, honor, [and] integrity" from government harm. Goss, 419 U.S. at 574 (quoting Constantineau).

The Court agrees that receiving an orange sticker might be humiliating. However, the Supreme Court has made clear that due process claims cannot rest on harm to "reputation alone." Paul v. Davis, 424 U.S. 693, 701 (1976). A party must point to "some more tangible interests" that the government has impaired. Id. "[T]he reputational injury must be accompanied by a change in the injured person's status or rights under substantive state or federal law." Silva v. Worden, 130 F.3d 26, 32 (1st Cir. 1997). This could take the form of employment termination, see Paul, 424 U.S. at 701, suspension from a public school, which was the injury suffered by the plaintiffs in Goss, see 419 U.S. at 567, or revocation of the right to buy alcohol, a privilege taken away in Constantineau, see 400 U.S. at 435.

In defamation actions against state officials, the "more tangible" requirement translates into what is known as the "stigma-plus" standard. The "plus" aspect of the test requires proving that steps taken by "a government actor adversely impact a right or status previously enjoyed under state law." Pendleton v. City of Haverhill, 156 F.3d 57, 63 (1st Cir. 1998) (citing Paul for the principle that reputation alone is not protected). In Pendleton, the police arrested the plaintiff on

24

drug charges, but a judge dismissed the case upon learning that the alleged contraband had not been tested.   Subsequently, the arresting officer told a newspaper reporter that he thought the plaintiff was guilty, divulging lurid details about alleged cocaine use.   After a story ran quoting the officer, the plaintiff's employer, a private organization, fired him.   See id. at 61-62.

The First Circuit held that the loss of the plaintiff's job did not measure up as a "plus" factor, for two reasons.   First, the state action that tarnishes a plaintiff's reputation must occur "incident to" the more tangible "plus" element. Pendleton, 156 F.3d at 63 (citation omitted).   In Pendleton, the "alleged defamation and the decision to cashier [the plaintiff] came from two separate, unrelated sources:" the arresting officer and the plaintiff's employer.   Id.   The First Circuit explained, "[t]he former cannot plausibly be said to have occurred 'incident to' the latter.   As such, the allegedly defamatory remarks cannot be viewed as working a denial of a previously recognized right or status."   Id.   For this reason, in later cases the First Circuit has rejected due process claims if the source of the "plus" and that of the "stigma" are two different actors, even where both are government entities.   See Hawkins v. R.I. Lottery Comm'n, 238 F.3d 112, 116 (1st Cir. 2001) ("In this case, the party responsible for the alleged

defamation [the governor of Rhode Island] was not the party responsible for the termination [the state lottery commission].”); see also WMX Techs., Inc. v. Miller, 80 F.3d 1315, 1320 (9th Cir. 1996) (explaining that, under the “stigma-plus” approach, a plaintiff cannot rely on “injury caused by the act of some third party”).

Second, a valid “plus” factor requires the loss of “government benefices denied as a result of governmental action.” Pendleton, 156 F.3d at 63. The loss of the plaintiff’s job did not qualify, because he “worked for a non-governmental employer and lost a private (not a public) position.” Id. Accordingly, Pendleton made clear that the loss of private employment, or of business opportunities from private clients, cannot suffice as “more tangible” interests under Paul. Pendleton, 156 F.3d at 63; see Goulding v. Feinglass, 811 F.2d 1099, 1102-03 (7th Cir. 1987) (finding that lost business opportunities due to a damaged reputation did not create reputation-based liberty interest); see also Siegert v. Gilley, 500 U.S. 226, 241-242, (1991) (Marshall, J., dissenting) (explaining that Supreme Court cases finding stigma-based procedural due process violations involved “loss of present or future government employment,” as opposed to “private” employment) (emphasis in original).

26

In this case, Plaintiffs expressly premise their theory of harm on stigma. Consequently, the fact that their claims reach further than defamation — they challenge the law on its face, not merely a single defamatory application of it — does not relieve them of satisfying the "plus" element defined in Pendleton.

It is here that Plaintiffs run into a wall. Even construing the record, the briefs, and Plaintiffs' representations at oral argument most favorably to them, a cognizable "plus" factor eludes their grasp. They rely on various censures imposed by people other than Defendants in the wake of sticker postings. For example, as a result of the Town informing URI when student houses get stickers, some Plaintiffs have endured academic discipline, and one was suspended from the hockey team. (See Facts ¶¶ 30, 33.) Several have also been evicted from their apartments. (See id. ¶¶ 31-32.) As for the landlord Plaintiffs, some have been unable to rent apartments for the season.

The shortcoming of the claimed harms is that they all involve third parties in some way. To begin with, it is clear that the academic discipline and vacant apartments arise from independent decisions of actors who are "separate" from, and "unrelated" to Defendants: namely, URI officials and prospective tenants who elected not to rent houses with stickers. See

Pendleton, 156 F.3d at 63.   Even if catalyzed by government action, harms at the hands of those parties cannot serve as "plus" factors, any more than the employer's dismissal of the plaintiff in Pendleton could.   See id.; WMX Techs., 80 F.3d at 1320.

The fact that URI is a state institution does not help Plaintiffs, because it is a separate entity and not the source of the alleged defamation.   In Hawkins, the plaintiff complained that the governor of Rhode Island falsely accused him of a scandal, causing the state lottery commission to oust him.   See Hawkins, 238 F.3d at 115.   The plaintiff sued both the governor and the commission, relying on the "close relationship" between the two, but the First Circuit refused to recognize a due process claim.   Id. at 115.   "The only specific allegations of defamation refer to statements by the governor, while the termination was at the will of the [commission], which by law is fiscally and operationally autonomous."   Id. at 115-16. Therefore, "the party responsible for the alleged defamation was not the party responsible for the termination," and the plaintiff's stigma-plus theory collapsed.   Id. at 116.   The same is true here with respect to URI.   In fact, it is even less plausible that the "party responsible" for the stigma could have any ostensible authority over the "party responsible" for the

"plus" factor.   The Town is a municipality, whereas URI is operated by a branch of the state.[9]

As for the evictions, it is true that the line between Defendants and the source of "more tangible" harm blurs slightly with respect to this alleged injury.   Of course, landlords who ejected their tenants are "third parties" in the sense that they are not Defendants.   See WMX Techs., 80 F.3d at 1320.   But their actions are, at least arguably, not "unrelated" to the source of the stigma — the Town's enforcement of the Ordinance.   Section 46-34 gives landlords who "are actively attempting to evict a tenant from the premises" a defense to liability for penalties under § 46-35.   Ordinance § 46-34 (5).   Thus, the Ordinance incentivizes landlords to dispossess renters from any apartment that gets a sticker.

The evictions are thus closer to the mark than the type of "unrelated" plus factor exemplified by the plaintiff's termination in Pendleton.   Adopting the perspective of the third party responsible for the alleged "more tangible" harm drives

---

[9] The notice of Ordinance violations the Town provides to URI does not bridge the gap between the two.   In Hawkins, the allegation that the Governor influenced the lottery commission did not change the result.   Nor is this a case like Owen v. City of Independence, 445 U.S. 622, 630 (1980), in which, as the First Circuit pointed out, "the defendant at issue was not an individual, but the city" — in other words, a single entity — "and all of the challenged conduct was that of city officials." Hawkins v. R.I. Lottery Comm'n, 238 F.3d 112, 115 (1st Cir. 2001).

home the point.   It is one thing to learn that one's employee —
or, in this case, one's tenant — is unfit to fulfill the terms
of her contract because of criminal activity.   It is quite
another to be put to the choice of either terminating the
contract or facing criminal penalties oneself.   In other words,
the Ordinance coerces landlords to choose eviction out of self-
defense.   Thus, unlike the private employer's reaction to the
scandal in Pendleton, it is easier to see the landlords' actions
as an extension of the challenged government activity, rather
than truly "unrelated."

Ultimately, however, even if the Court could accept this
proposition, it would not secure victory for Plaintiffs.   As
explained below, the evictions do not qualify as "government
benefices denied as a result of governmental action" — the other
criterion for a "plus" factor.   Nor do they, or the other
alleged injuries, constitute government intrusion on protected
property or liberty interests independent from any stigma.   The
Court addresses each in turn.

     i.   Evictions

Although no canceled leases appear in the record, any
contract between private parties would secure private
obligations, not "government benefices."   The Rhode Island
Landlord-Tenant Act (the "Act") creates no right to particular
lengths of tenancy irrespective of lease terms that allow a

landlord to seek eviction.  On the contrary, a landlord may use streamlined eviction proceedings against any seasonal tenant who "has been charged with violating a municipal ordinance or has otherwise violated the terms of the rental agreement pertaining to legal occupancy or excessive noise or other disturbance of the peace."  R.I. Gen. Laws § 34-18-36(f) (2009).

For the same reason, the evictions do not rise to the level of interference with a protected "property" interest separate from the stigma imposed by orange stickers.  "Property" interests must rest on "legitimate claim[s] of entitlement" under state law, as opposed to "unilateral expectation[s]."  Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972). Such interests "are created and defined by existing rules or understandings that stem from an independent source such as state law."  Hatfield-Bermudez v. Aldonando-Rivera, 496 F.3d 51, 59-61 (1st Cir. 2007) (quoting Roth, 408 U.S. at 577) (quotation marks and alterations omitted).  Section 34-18-36(f) eliminates any argument that Plaintiffs could be "entitled" to continued occupancy notwithstanding an Ordinance violation.  Indeed, any seasonal tenant "charged with violating a municipal ordinance" may be subject to expedited eviction.  See R.I. Gen. Laws § 34-18-36(f).

ii. Lost rents

These conclusions apply to the rents landlords have been unable to earn from vacant properties as well.  Nothing in the Act gives landlords the right to have tenants lease their apartments all year.  Where a tenant and landlord do decide to enter a lease, the Act contemplates that they may agree on the amount of rent to be paid.  See R.I. Gen. Laws § 34-18-15(a). The Act thus envisions that owners' ability to earn revenues by leasing their property depends on willing lessees.  This falls short of creating a "legitimate claim of entitlement" to a desired rental value for an apartment, or transforming rental income into a "government benefice."

Moreover, in this context, losing rent for as long as an orange sticker remains in place is not the type of temporary injury to real property that has been held to violate due process.  "The Supreme Court has held that 'even the temporary or partial impairments to property rights that attachments, liens, and similar encumbrances entail are sufficient to merit due process protection.'"  Garcia-Rubiera v. Calderon, 570 F.3d 443, 457 (1st Cir. 2009) (quoting Connecticut v. Doehr, 501 U.S. 1, 12 (1991)).  The reason is that such devices may "cloud[] title, limit[] alienability, [and] affect[] current and potential mortgages."  Id. at 457-58 (citation, quotation marks, and internal alterations omitted).  The property owners here

32

might insist that "limiting alienability" is exactly what the orange stickers achieve, as evidenced by the vacancies. However, this is not due to any legal effect the sticker has, but the practical reality that potential renters find houses with stickers less desirable.   Unlike liens or attachments, which create interests that might trump those of future tenants, buyers, or creditors, the sticker does not erect any legal barriers to renting, selling, or mortgaging a residence.   The "orange sticker" provision is therefore not analogous to those encumbrances.

Of course, the distinction between legal effects and practical consequences means little to the landlord Plaintiffs. The end result is the same: they lose (potentially) a season of rental income.   But the Fourteenth Amendment does not protect against every law that has the ultimate outcome of making property less profitable.   See BAM Historic District Ass'n v. Koch, 723 F.2d 233, 237 (2d Cir. 1983) (rejecting due process claim targeting zoning regulations that arguably decreased quality of life in a neighborhood, "causing a decline in property values," where owners failed to demonstrate "that their property has been taken or their use of it so drastically regulated as to destroy its value")   Here, the vacancies that allegedly resulted from the Ordinance do not fit any category of constitutional harm recognized in case law.

In fact, a comparison to the closest possible match the Court has located, Hidden Oaks Ltd. v. City of Austin, 138 F.3d 1036, 1040 (5th Cir. 1998), pinpoints another obstacle for Plaintiffs: they have not proven that the lost rents are attributable to state action.   See Logiodice v. Trustees of Maine Cent. Inst., 296 F.3d 22, 26 (1st Cir. 2002) (explaining the state action requirement in Fourteenth Amendment cases).   In Hidden Oaks, the Fifth Circuit recognized a due process violation where a municipality placed a two-year "utility hold" on the plaintiff's apartment complex, thereby precluding the collection of rental income.   Hidden Oaks, 138 F.3d at 1040, 1046-47.   Cutting off utilities effectively rendered the apartments uninhabitable; thus, there were no further steps necessary to complete the alleged injury.[10]   Not so here: Plaintiffs do not represent that orange stickers prevent apartments from being placed on the market, unlike a lack of power or hot water would.[11]   Therefore, it is clear that the vacancies would not have occurred but for the decisions of renters to avoid stickered houses.   Plaintiffs have failed to

---

[10] See Hidden Oaks Ltd. v. City of Austin, 138 F.3d 1036, 1039 (5th Cir. 1998) (explaining that utility service could not be reconnected once a tenant moved out of a unit).

[11] Instead, they assert they "have not been able to rent out" their property, which indicates that they have attempted to do so.  (Facts ¶ 36.)

demonstrate that such third-party choices are "fairly attributable" to the Town, such that they can be deemed to result from state action. Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982); see Sullivan v. N.J. Div. of Gaming Enforcement, 602 F. Supp. 1216, 1220 (D.N.J. 1985) (rejecting a Fourteenth Amendment claim where a third party breached a contract with the plaintiff following a state action, and observing that courts do not allow due process claims "whenever a state officer is indirectly involved in the chain of events leading to [the] plaintiff's harm").

For each of these reasons, the lost rents do not on their own give rise to a due process claim.

### iii. URI discipline

As stated above, the fact that URI officials are not responsible for the alleged stigma douses the notion that disciplinary measures could serve as "plus" factors under Pendleton. Yet, the student Plaintiffs correctly assert that they possess a liberty interest in pursuing higher education. The Ordinance itself, however, does not interfere with educational freedom.

"[A] student facing expulsion or suspension from a public educational institution," such as URI, "is entitled to the protections of due process." Gorman v Univ. of R.I., 837 F.3d

7, 12 (1st Cir. 1988).[12]   Here, no Plaintiff claims to face
penalties that harsh.   Some have been subject to unspecified
"sanction[s]" (Facts ¶ 30); another was suspended from the
hockey team (see id. ¶ 33).   It is not clear that these events
put constitutional due process into play.   See Seamons v. Snow,
84 F.3d 1226, 1234-35 (10th Cir. 1996) ("With regard to the
specific components of education which [the plaintiff] claims
were lost (e.g., the right to participate in sports, to take
advanced placement classes, and to attend a particular school),
we do not believe that [the plaintiff] has a constitutional
right to those particular incidents of education.").

       In any event, assuming for the sake of argument that they
do, the process due in such circumstances applies to "the
procedures employed in a disciplinary action" itself.   Gorman,
837 F.3d at 12.   Thus, a student could raise a procedural due
process challenge to constitutional deficiencies in URI's
disciplinary procedures, as the URI-student plaintiff in Gorman
did.   But here, Plaintiffs do not name URI as a defendant, or
allege any flaws in the disciplinary process.   Moreover, they

_____

       [12] But see Williams v. Wendler, 530 F.3d 584, 589 (7th Cir.
2008) ("[The plaintiffs] premise the claim entirely on the bald
assertion that any student who is suspended from college has
suffered a deprivation of constitutional property.   That cannot
be right. . . . [T]he Supreme Court requires . . . proof of an
entitlement [defined by contract with the school].").

provide no authority for the proposition that educational freedom gives rise to a cause of action against a municipality whose actions precipitate university sanctions.

## 2. Conclusion

The reasoning above suffices to reject Plaintiffs' procedural due process claims. Yet, the result sits uneasily with the Court.[13] Experience teaches that law enforcement is not perfect. What happens if the police, though acting in good faith, put stickers on some homes where no "unruly gathering"

---

[13] A major reason for this is that, if Plaintiffs could demonstrate that a protected interest was at stake, it is likely that the Town's procedures in connection with § 46-32 would be inadequate. The Town proposes that defamation claims under state law are available to redress the harm from any improperly-posted stickers. Yet, state tort lawsuits filed after the fact only suffice to remedy "random and unauthorized" government actions. Chmielinski v. Mass., 513 F.3d 309, 315 (1st Cir. 2008); see Smith v. Mass. Dep't of Corr., 936 F.2d 1390, 1392-93 (1st Cir. 1991) (explaining allegations that the defendants abused their authority by threatening and coercing witnesses to fabricate complaints against the plaintiff). Unlike malicious prosecution, the conduct at issue in Smith, posting an orange sticker is an "established state procedure," because the Ordinance expressly authorizes it. Rivera-Powell v. New York City Bd. of Elections, 470 F.3d 458, 465 (2d Cir. 2006). Because the Town can thus anticipate the imposition of the penalty, the ability to later sue for defamation would not be good enough if there were a protected interest in play. In that case, the Court would likely find that the Town could offer a hearing after an "unruly gathering" is disbanded, but before punishing anyone with a sticker — similar to the standard procedure for traffic tickets.

actually occurred? Such errors appear to fall between the cracks and allow for no remedy. They are neither constitutional violations, nor, in the majority of cases, the types of mistakes that would be fruitful to pursue in a defamation lawsuit. For landlords, there is no right to a hearing before an orange sticker goes up, but the resulting loss of a few thousand dollars in rent is not likely to justify the cost of litigating a defamation claim. For students, the cost-benefit comparison yields a similar outcome, unless eviction or academic discipline results in a disaster such as expulsion or extreme emotional distress. This is especially true given the high bar to punitive damages for defamation under Rhode Island law. See Johnson v. Johnson, 654 A.2d 1212, 1217 (R.I. 1995) (stating that "the party seeking punitive damages [must produce] evidence of such willfulness, recklessness or wickedness . . . as amounts to criminality") (internal quotation marks, alterations, and citation omitted). The Court thus cannot help but wonder whether wrongfully-applied stickers simply evade a meaningful remedy altogether.

The Court has reflected on the possibility that, for due process purposes, real property may deserve a special status. Some of the Supreme Court's Fifth Amendment "takings" jurisprudence suggests that real estate enjoys greater protection than other types of property. See, e.g., United

States v. Sperry Corp., 493 U.S. 52, 62 n.9 (1989) (remarking that, unlike an intrusion on real property, "no special constitutional importance attache[d]" to the government's appropriation of money); Eastern Enters. v. Apfel, 524 U.S. 498, 541-42 (1998) (Kennedy, J., concurring in judgment and dissenting in part) (listing traditional property interests under the "takings" doctrine, most of which concern real property).

In fact, if the stickers could remain in place permanently, Plaintiffs arguably would have a viable takings claim, because the stickers are "physical" intrusions, however "minute." Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1015 (1992) (explaining that "permanent" physical intrusions, "no matter how minute," give rise to a takings claims). Yet, Plaintiffs did not plead this action as a taking. No case the Court has found transplants the per-se rule for physical takings codified in Lucas into the general due process context.

The Court is at a loss for any way to put Plaintiffs' injuries into a legal box other than purely reputational harms. It is true that, factually, the physical placement of an orange sticker on a house is different than a lost job opportunity, or sullied business reputation, in that the former is a tangible interference with real property; but legally, in terms of procedural due process, there is no difference.

For each of the foregoing reasons, Plaintiffs fail to show that the Ordinance tramples on a protected liberty or property interest.     Therefore, Plaintiffs' procedural due process challenge to the Ordinance must be rejected.

### E.   Equal Protection

Plaintiffs also contend that the Ordinance violates the Equal Protection clause, which obligates states to "treat alike all persons similarly situated." Toledo v. Sanchez, 454 F.3d 24, 33 (1st Cir. 2006).  The general standard of review requires only that the "classification drawn by the statute is rationally related to a legitimate state interest." Cook v. Gates, 528 F.3d 42, 61 (1st Cir. 2008) (quotation marks and citation omitted).  Under a rational basis review, courts defer to state laws, and need perform only a succinct analysis of their purpose and effect.  See, e.g., Naeem v. Gonzales, 469 F.3d 33, 38 (1st Cir. 2006) ("Congress passed the IIRIRA with the intention of improving the alien removal process.   The amendments to the voluntary departure provision are rationally related to that end.").  Here, the purpose of the Ordinance is to improve the quality of life in the Town by discouraging parties that attract lawbreaking activity, which flourish due to seasonal housing and absentee landlords.  (See Facts ¶¶ 6-7 & preamble to Ordinance at Ex. A.)  To this end, it prohibits gatherings that create a nuisance as a result of misdemeanors such as excessive noise,

40

traffic, public drunkenness, underage drinking, fights, and litter. See Ordinance § 46-31. The Court has little difficulty concluding this effort is rationally related to the stated objective.

Plaintiffs, however, cite Justice O'Connor's concurrence in Lawrence as authority for their argument that they are entitled to closer scrutiny of the Ordinance. "When a law exhibits . . . a desire to harm a politically unpopular group," the Supreme Court has applied "a more searching form of rational basis review . . . under the Equal Protection Clause." Lawrence, 539 U.S. at 580 (O'Connor, J., concurring). Plaintiffs propose that the history of conflict between URI students and Town homeowners makes students and renters "politically unpopular groups." They point to the charts maintained by the Town tracking URI student infractions, and the Town's notification of URI whenever students receive Ordinance citations, as evidence of anti-student animus. Defendants even admit that the Ordinance was conceived as a way to combat problems the Town associates with renters. (See Facts ¶¶ 6-7.)

Plaintiffs' push for a "more searching" review fizzles, because nothing in the text of the operative provisions of the Ordinance draws any distinction between permanent Town residents, on the one hand, and seasonal renters — student or otherwise — on the other. The language of the law does not

exclude homeowners.   By its terms, the Ordinance is equally enforceable against the purported "politically unpopular" group and everyone else in the Town — indeed, against the very council members who voted for it.   The same is not true of the laws at issue in the Supreme Court cases using a "more searching" review.   For instance, the terms of the statute under review in Romer v. Evans, 517 U.S. 620 (1996) applied to gay, lesbian, and bisexual people, but not straight people.   See id. at 624.   The terms of the ordinance at issue in City of Cleburne, Texas v. Cleburne Living Ctr., Inc., 473 U.S. 432 (1985) placed a heavier burden on mentally disabled people than others.   See id. at 437. Finally, the language of the statute struck down in United States Dep't of Agric. v. Moreno, 413 U.S. 528 (1973), conferred lesser benefits on unrelated individuals living in the same house than on households in which everyone was related.   See id. at 530-31.   In each case, the language of the laws themselves, and not the context for their enactment, created the challenged classification.

For that reason, Plaintiffs have not shown that any firmer judicial check on the Ordinance is warranted.   Because the Court holds that the Ordinance survives rational basis scrutiny, Plaintiffs' equal protection claim must be denied.

**F.    Rhode Island Landlord-Tenant Law**

Finally, Plaintiffs assert that the Residential Landlord and Tenant Act, R.I. Gen. Laws § 34-18-1 <u>et</u> <u>seq.</u>, preempts the Ordinance. This claim is underdeveloped. To show preemption, Plaintiffs must demonstrate either that the Ordinance "conflicts" with the Act, or that the state legislature intended the Act to "completely occupy the field of regulation" on landlord and tenant law. <u>Amico's Inc. v. Mattos</u>, 789 A.2d 899, 907 (R.I. 2002) (quotation marks and citation omitted). Plaintiffs do not cite a particular "conflict" between the two laws. They do suggest that the eviction defense in § 46-34 (5) interferes with the Act, but the Act shows otherwise. It authorizes landlords to commence eviction proceedings for "material noncompliance" with a lease, or violations of the Act "materially affecting health and safety." R.I. Gen Laws § 34-18-36(a). In fact, as indicated above, the Act allows streamlined procedures when seasonal tenants have "been charged with violating a municipal ordinance or [have] otherwise violated the terms of the rental agreement pertaining to . . . excessive noise or other disturbance of the peace." <u>Id.</u> § 34-18-36(f)(ii). Furthermore, given that the R.I. Legislature expressly dovetailed the Act with "municipal ordinance[s]," there can be no legitimate claim that it intended the Act to fully "occupy the field." <u>See</u> <u>Amico's</u>, 789 A.2d at 907

43

(rejecting a preemption argument where "the Legislature has recognized the authority of municipal bodies to regulate" the conduct at issue).

## III. Conclusion

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment is DENIED and Defendants' Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED:


*/s/ William E. Smith*

William E. Smith
United States District Judge
Date:  March 2, 2010

44